Argued February 21, reversed June 4, rehearing denied September 17, 1929.

JOHN SCARPELLI, ADMINISTRATOR, *v.* PORTLAND ELECTRIC POWER CO. ET AL.

(278 Pac. 99.)

For appellant there was a brief over the name of *Messrs. Griffith, Peck & Coke,* with an oral argument by *Mr. Cassius R. Peck.*

For respondent there was a brief and oral argument by *Mr. Robert R. Rankin.*

*Mr. E. M. Morton* on briefs for Salvatore Partipilo.

ROSSMAN, J.—We shall first consider the assignment of error predicated upon the refusal of the Circuit Court to direct a verdict in favor of the appellant. The facts material to this assignment of error we shall now outline. February 15, 1926, at 9:15 P. M. the deceased and ten others were riding in a seven-passenger open model Hudson automobile south on East 12th Street in Portland. One Phillip Partipilo, seventeen years of age, was the driver; in the front seat, beside the latter, were two others. Seated on the rear seat was the deceased, his wife, and one other; on the deceased's lap was his sixteen year old daughter. Between the front and the rear seats were two auxiliary seats, referred to by the witnesses as "jumper seats"; these were occupied by four of the passengers, three of whom were children ranging in age from seven to fourteen years. The night was dark and the pavement was wet; the street was resi-

dential in character. Besides the Hudson car there were only two other vehicles in sight; one was the street-car of appellant, which was proceeding in the opposite direction, that is north, the other was a Chevrolet automobile driven by Mr. L. L. Fulmer, a short distance ahead of the Hudson. The point, which was being approached by the three vehicles, was the intersection of 12th and Spruce Streets. A few feet south on the east side of 12th Street was Mr. Fulmer's home, with a driveway leading to his garage; his objective was the latter, but, due to the fact that on the railway tracks which lay between him and the driveway, the street-car was approaching 150 feet away he stopped next to the curb and deferred crossing until the car could pass. This point was about thirty feet south of the intersection. As a witness for the plaintiff Mr. Fulmer testified to the foregoing, adding that he gave the stop signal before slowing down. He also testified that after his car had been standing at the curb for ten or fifteen seconds a crash occurred directly to his left; this was the collision between the Hudson and the street-car in which the deceased lost his life. The evidence shows that the Hudson was following the Chevrolet, and that when the latter stopped the Hudson attempted to avoid collision with it by steering to the left, disengaging the clutch and applying the brakes; there was ample room between the tracks and the Fulmer car for a safe passing. Partipilo's efforts, however, caused the Hudson to skid for about fifty-five or sixty feet in the course of which it veered from the right-hand side of the street and took a position on the car tracks with its rear facing the oncoming street-car. When the motorman saw this situation he applied the emergency brake, and sanded the rails, but his car

stopped too late to avoid collision with the automobile. The skid marks, as well as the testimony, indicate that the Hudson, in its skidding course, first went straight ahead and then, after crossing Sherman Street, reversed itself. These marks stopped at approximately the point of collision; this circumstance would seem to warrant the inference that the street-car's momentum had been materially checked before the impact. Mr. Fulmer testified that the street-car continued for about eleven or twelve feet after the impact before stopping; others judged this distance as less. There is no evidence that its speed was excessive; the witnesses estimated the latter as perhaps fifteen, but not more than twenty miles per hour before the brakes were applied. The lights were burning on the street-car and the competency of the motorman, who had had eight years of experience, was not questioned upon the trial.

The above facts are established by the undisputed evidence, with the possible exception of the giving of a stop signal by Mr. Fulmer; Phillip Partipilo, as a witness called on behalf of his father, who was a defendant in the action, was asked: "Did you see him (meaning Fulmer) make any signal. A. No." Neither of the other two occupants of the front seat, nor anyone else in the automobile, was asked concerning the stop signal.

■ The charge of negligence against the appellant was divided into five subdivisions; that which was predicated upon an averment of incompetency in the motorman was expressly withdrawn from the jury's consideration because of plaintiff's failure to submit proof, and that which alleged excessive speed brought forth an instruction that there was no evidence that the street-car's speed exceeded twenty miles per

hour. The remaining specifications of the general charge of negligence, aver failure to maintain a lookout, failure to stop in time to avoid collision, and operation of the street-car at a negligent rate of speed when the attendant circumstances of darkness and a wet pavement are considered. The assignment of error, predicated upon the denial of the motion for a directed verdict, raises the issue whether the street-car was a sufficient distance south in 12th Street when the possibility of a collision became apparent, so that the motorman had a reasonable opportunity in the exercise of due care to stop. It is obvious that the ruling below can be sustained only in the event that the evidence warrants a finding in the affirmative upon that issue. We shall now review all of the evidence favorable to the plaintiff which has a tendency to indicate the street-car's position when the Hudson began to skid and was approaching the point of impact. This evidence, for better analysis, may be segregated into two divisions; into the one we shall assign all testimony which shows the distance between the two vehicles at the time in question, and into the other we shall place that which indicates the length of the moment which intervened from the time the Hudson started to skid until the collision occurred. The following, we believe, is all of the evidence which affects these two subject matters. Emle Staine, an occupant of the Hudson was asked, "Where was the street car at the time you skidded?" he answered, "Oh, that was about, I guess over a block. Q. Over a block? A. Over a block away." Amelia Leonetti, another occupant of that car, in referring to the street-car, testified: "A. I seen the street car right before the car skidded, and I was sitting on my dad's lap, and I could see it, because I

was sitting high, and it was quite a ways off." Mr. L. L. Fulmer, as we have previously observed, testified that the street-car was about 150 feet distant as he approached his driveway, that he therefore stopped, so as to allow the street-car to pass before undertaking to cross its rails, that after he had been parked for ten or fifteen seconds the collision occurred directly to his left. Frank Leonetti, fifteen years of age, testified: "Did you see any street car? A. Yes, sir. Q. Where did you see the street car? A. I saw the street car about a block down, or so. Q. When did you see that? A. When we skidded around. * * Q. When you saw the street car, about how far was it? A. It was say about a block, a block or so." Louis Leonetti, twelve years of age, did not see the street-car until the automobile had completely reversed itself; he then arose looked out of the small window in the rear of the touring-car and saw the street-car; he had just resumed his seat when the impact occurred; he testified: "It wasn't very far away." Mrs. Regina Staine testified: "As the car turned, I just happened to glance up, and I saw the street car, to my judgment at least one block away." Phillip Partipilo testified that he did not attempt to apply his brakes until he had reached the south curb stone of Sherman Street, and that at that time the street-car was crossing Caruthers Street, which was two hundred feet from Sherman Street. He testified that his car did not skid at once, but failed to state where the street-car was when his car began to display evidence of helplessness. The motorman, after testifying that his car was "about seventy feet" from the Hudson when the latter began to skid sideways, was asked: "Q. Then when he started to skid, how far were you from him? A. I was about one hundred fifty feet.

Q. From him? A. Probably that far. I don't know. I did not see him when he first started to skid."

We come now to those bits of evidence which the plaintiff relies upon to show how much time elapsed in the course of the above events and to establish his contention that the Hudson was standing still when it was struck. The first of the above witnesses, Emle Staine, testified:

"A. And then when the automobile stopping, I wanted to get out of the automobile; I seen, too, what is the matter.

"Q. You wanted to get out of the automobile and see what is the matter? A. What is the matter, stop like that.

"Q. To see why you stop? A. Yes, and I started to get up, you know, and I got my hands here, you know, and when I got up I felt the pressure of the back.

"Q. You put your hands on the door? A. Yes. I sit down like this on the seat, I sit down like this, and then I get up, and when I got hands on the door to try open to go out, then I feel crashing back."

"(The crash was the collision.)

The witness was seated on the right-hand side of the rear seat. Amelia Leonetti testified that "a short time after the skidding the motor stopped: then all of a sudden I felt the crash"; she added "it was a very short time after the Hudson stopped that the crash occurred." Frank Leonetti testified: "I could not tell you if we stopped, or not"; he added that he was not nervous because "I thought we had plenty of time to make the turn and go away." He testified that he thought that they were supposed to turn at that point and that the car was being turned under the direction of Partipilo. Louis Leonetti, the twelve year old boy who arose from his seat and looked out

of the rear window, testified that he arose, took a look, and as he sat down the crash occurred. He was not certain that the Hudson had come to a stop, but added "I thought we had plenty of time to go ahead." Mrs. Regina Staine, who was seated on the front seat of the automobile, testified, "I thought that the driver was turning to go up a side street, and then he stopped." Partipilo testified that the street-car "probably hit me instantly" when his Hudson came to a rest upon the tracks.

It will be observed that the witnesses described the intervening space in terms of "a block." None of them defined the number of feet which they estimated constituted the length of a block, nor were any of them any more definite than is indicated by the foregoing quotations. None of them made use of a chart, nor fixed the positions of the vehicles by reference to the cross-streets except Partipilo and Fulmer. These circumstances render it pertinent to observe that the cross-streets enter 12th Street in an unusual manner, and that the length of the blocks on the east side of the street are very much longer than those on the west side. None of the witnesses resided in the immediate vicinity of the accident, and most of them lived in a portion of the city remote therefrom. We shall now describe the street and block arrangement at the place of the accident. Entering 12th Street from the west at spaces of 200 feet are Grant, Sherman and Caruthers Streets; they enter at angles of 90°, but do not cross 12th Street. In the vicinity of the place of the accident only one street enters 12th Street from the east; it is Spruce Street and enters from the northeast at an angle of approximately 45°. It also does not cross 12th Street. Its northerly line, if extended, would pass a few feet beyond the south

line of Sherman Street, while its southerly line, if extended, would be approximately one-half way between Sherman Street and Caruthers Street. Two hundred feet south of Spruce Street is an alley, more than twenty feet wide; between the alley and Spruce Street are two private driveways.

▆ The above, we believe is a fair statement of all the evidence available to support the verdict. It will be observed that the testimony which describes the length of the intervening space consists partly of a guess, and partly of a surmise that the distance was "about a block down, or so." A mental impression fails to rise to the dignity of admissible testimony if it consists of nothing more definite than a guess or a conjecture: Chamberlayne on Evidence, § 2068; *Johnson* v. *Hovey,* 98 Mich. 343 (57 N. W. 172); *Orr.* v. *Cedar Rapids & M. C. Ry. Co.,* 94 Iowa, 423 (62 N. W. 851). The two boys, twelve and fifteen years of age respectively, who were unaware whether the automobile had stopped, were manifestly incapable of expressing a reliable opinion concerning the operation of an automobile and a street-car: *Billingsley* v. *Nashville C. & St. L. Ry.,* 177 Ala. 342 (58 South. 433). It will be observed that while some of the above witnesses testified to where the street-car was when the automobile started to skid, or before it skidded, they did not mention its position after the Hudson began to display evidence that it was likely to drift helplessly upon the street-car tracks. It seems to us that the testimony of the witnesses Emle Staine, Frank Leonetti, Amelia Leonetti and Regina Staine, which employed the word "block" is too indefinite to be capable of supporting a judgment. It is impossible to determine from the testimony of those witnesses whether they had in mind their personal conceptions

of the length of a block obtained from observations in the neighborhood of their homes, or the long blocks as they are arranged on the east side of the street, or the short blocks as they appear on the west side of the street. In order to be admissible a fact should not be so indefinite that no certain and definite inference can be drawn from it: Chamberlayne on Evidence, § 1743. As a general rule a party is never permitted to put in evidence a fact which does not directly prove the fact in issue, but which is only a step in that direction and from which therefore various indefinite inferences as to the principal fact might be drawn, unless he follows it up with other accompanying facts which make definite and certain the inferences as to the main fact. So, also, it seems to us that to be usable the foregoing testimony should have been followed with some proof which would have a tendency to indicate what the witnesses meant by a "block." Next it will be observed that three of the above witnesses rendered the foregoing term more vague by adding to it similarly loose expressions; for instance, "I guess over a block"; "it was quite a ways off," and "about a block down, or so." But we prefer to rest our conclusion upon the premise that all of the foregoing testimony fails to supply any inference as to the real subject matter of investigation, and that was and is the point at which it became evident that the automobile was likely to come to rest upon the street-car tracks when the street-car would reach the same point. Thus, the question is not where the street-car was when the witnesses observed it, nor where it was when the automobile started to skid, nor even where it was when the Hudson began to turn; the proof, before mentioned,

supplies the latter facts, but not the former. The presence of an automobile upon the street, or even upon the tracks, does not call for instant action by the motorman; his duty to put his car under control arises when he realizes, or in the exercise of due care ought to realize, that there is danger of a collision; the authorities are collected in a note to *Callahan* v. *Boston El. Ry.*, 18 Ann. Cas. 510; but, when it becomes apparent that the vehicle ahead cannot be gotten off of the tracks in time to avoid a collision, the motorman should stop his car; see note to *Green* v. *Louisville Ry. Co.*, 7 Ann. Cas. 1127. The undisputed evidence, which includes the reproduction of the skid marks on a comprehensive plat, indicates that the Hudson shortly after its brakes were applied, skidded ahead, taking a course a little to the left so as to avoid the Chevrolet, then after approximately two thirds of its skidding course had been covered, it swung toward the center of the street with its rear veering around until it faced the oncoming street-car. Upon a dark night, with a wet pavement a car, which is skidding forward, presents to those ahead in the center of the street no forewarning of a possible collision. A slight movement to the left, when there is a parked car ahead, would not be interpreted as anything but an effort to avoid collision with the latter. The possibility of a collision under the circumstances of this case was not apparent until it appeared that the Hudson had escaped from the control of its driver and was approaching the street-car tracks in a helpless condition. This statement is warranted by the fact that some of the occupants of the automobile, themselves, mistook its act of turning as an effort of the driver to proceed into an adjacent street, presumably Spruce Street. In fact the point of impact

is almost precisely at the center of the intersection of Spruce and 12th Streets. Had the Hudson continued upon the course which those occupants presumed it was following, no collision would have occurred; it was the car's act of stopping, and the driver's failure to put it into gear that resulted in the collision. Here, then, we have a situation where a car, in order to avoid collision with another, steers a little to the left, goes ahead and then takes a course as though it is about to pass from 12th Street into Spruce Street, but instead of doing so, its rear swings around, and it comes to a rest a few feet ahead of an oncoming street-car without any effort upon the part of its driver to resume its momentum. He testified that the engine was running at all those times. To support the verdict the evidence must warrant a finding that it had become apparent that the Hudson would adopt the above course in time to afford the motorman a reasonable opportunity to stop. The latter testified that when the street-car was seventy feet distant the Hudson began its side movement, and that he at once applied the brakes. We find no evidence in conflict with his statement. The general vague statements of the witnesses concerning "a block" supply no inference which overcomes his testimony. Before the brakes were applied the street-car was proceeding at the rate of eighteen miles per hour. We have the assurance of the complaint that one of the factors which produced the collision was the negligence of the driver of the Hudson. The jury's verdict cannot be construed as a finding that Partipilo was free from negligence because the instructions charged the jury that the deceased was responsible only for his personal misconduct. The plaintiff does not contend that the driver's negligence had spent itself and remained

only as an idle condition, as is illustrated in the last clear chance doctrine; quite to the contrary he emphatically insists that that doctrine has no application to this case, and alleges that Partipilo's negligence was one of the proximate causes of the collision. To us it seems that the evidence is incapable of any construction other than that the action of the Hudson presented to the street-car an emergency which had not been produced by any negligent act of the appellant.

■ When there is insufficient time available for reflection, and a judicious choice between methods, the one, who is thus compelled to act in haste, is not liable for an unfortunate result, provided he exercised in the emergency the degree of care generally displayed under like circumstances by the law's standard, a reasonably prudent individual. Under such circumstances the result, if unfortunate, is attributed to an unavoidable accident: *Marshall* v. *Olson,* 102 Or. 502 (202 Pac. 736); *Stabenau* v. *Atlantic Ave. R. Co.,* 155 N. Y. 511 (50 N. E. 277, 63 Am. St. Rep. 698); *Solatinow* v. *Jersey City, H. & P. St. Ry. Co.,* 70 N. J. Law, 154 (56 Atl. 235); *Chicago Union Traction Co.* v. *Browdy,* 206 Ill. 615 (69 N. E. 570); 20 R. C. L., Negligence, § 22; 45 C. J., Negligence, §'92, p. 710.

As we observed before, when the street-car was seventy feet from the Hudson, the motorman applied his brakes; his car could be stopped in approximately sixty-two feet upon a wet rail. The Hudson, however, continued down the street, got on to the rails, and stopped. We adopt plaintiff's contention that it stopped, because there is some evidence to that effect; but, it is clear that it stood motionless for only an instant, and that brief interval of time was insufficient to enable the motorman to adopt some new course. In fact he had already done all that could be done; he

had applied the brakes and sanded the rails. To ring a bell, or sound a horn would do no good; the street-car could not steer to the right nor to the left; it could not take wings and pass over the helpless automobile; at that moment some of the occupants of the latter wondered why Partipilo did not put the Hudson in motion; had he done so no collision would have occurred. Had the Hudson pursued the course into Spruce Street, which was indicated at one time by its turning, this unfortunate result would have been avoided. But, after the street-car had proceeded forty-five or fifty feet the two vehicles came into collision. We find nothing in these circumstances which charges the appellant with negligence. We fail to understand what more the motorman could have done. The Hudson was 105 or 110 feet from the street-car when it started to skid; the latter applied its brakes when the two were seventy feet apart; hence the motorman detected the helplessness of the automobile after it had skidded only thirty-five or forty feet. Our conclusion that the motion for a directed verdict should have been allowed, is supported, we believe, not only by the principles of law previously mentioned, but also in the application of those principles of facts, somewhat analogous in the following adjudications: *Stabenau* v. *Atlantic Ave. R. Co., supra; Solatinow* v. *Jersey City H. & P. St. Ry. Co., supra; Chicago Union Traction Co.* v. *Browdy, supra.*                    REVERSED. REHEARING DENIED.

COSHOW, C. J., dissents.

MCBRIDE and RAND, JJ., concur.